**Opinion issued April 14, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-15-00302-CR

_____

**JASON BURROWS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 412th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 74447**

---

**O P I N I O N**

Appellant, Sheriff Deputy Jason Burrows, appeals his conviction for official oppression stemming from allegations that he inappropriately touched a woman's breasts during a traffic stop. We affirm.

BACKGROUND

**A.    Trial Testimony**

**1.    The State's Case**

M. Martinez, the complainant, testified that she is married with one child and lives in Pearland with her husband.  In 2012, she worked at restaurant called Taco.com.  J. Mendieta, a friend of her husband's family, was her boss.  Her shift generally started at 5:00 a.m. to prepare food for the restaurant's 5:30 a.m. opening.

On June 10, 2012, she got up at 4:00 a.m. and left for work about 4:30 wearing a loose-fitting red shirt with a Taco.com insignia.  Martinez testified to the route she drove—from her street, she would start on County Road 128, then she would take a right turn at the four-way stop onto Highway 99.  On the morning of June 10, when she approached the four-way stop at Highway 99, there was a police car at the stop sign in the oncoming lane of County Road 128.  She stopped at her stop sign to wait for the police car, which had arrived at the intersection before her, to go first.

After Martinez turned right on Highway 99, the police car began to follow her.  At one point, she swerved to avoid a dog that had run into the road in front of her.  After she continued driving for a while, the police car activated his overhead

lights, and she pulled over. Highway 99 is bordered by a ditch at that point, so her car was partially in the road, and partway into the grass beside the ditch.

A male officer, appellant, wearing a brown police uniform and a badge, approached and told Martinez that he pulled her over because she had swerved into the oncoming lane at one point. After she admitted not having a driver's license, he told her to get out of her car. He asked where she was going, and she told him where she worked and that she was on the way there. He never asked her name, and he did not return to his car to run her name or plates. Instead, he told her to get back into her car and drive to a particular gas station.

Appellant followed her to the gas station with his overhead lights off, but with a spotlight shining into her car. The gas station was closed, and she parked on the side of the building waiting for the officer to approach, who she assumed would write her a ticket. It was still dark outside, and the only light on at the gas station was the one by the gas pumps. Appellant approached Martinez and again told her to get out of her car. They stood between their two cars, and he asked why she was driving without a license. She responded that she needed to work to support her young daughter. He asked her name and to spell it, but she was unable to, given the language barrier. Appellant then gave her his tablet and asked her to write her name, which she did.

3

Appellant then questioned her about who her boss was, and she responded "J. Mendieta." He then asked who her car belonged to. She responded that it belonged to her husband. He asked if her husband had a driver's license, and she responded, "yes." Appellant then asked Martinez whether she had a green card, and she responded, "no."[1]

Appellant asked Martinez what she had underneath her shirt, to which she responded "nothing." He told her to put her "hands on top of the car and that he was going to check me out." She put her hands on top of her car and he stood behind her, patting her body down. He inquired again about what was underneath her shirt, and she again insisted "nothing."

Appellant walked around and turned off the headlights and interior light of Martinez's car. In an aggressive voice, he then instructed her to walk over towards a dark grove of trees. Martinez got the impression he was trying to scare her, and she was scared. She told him she wanted to stay by the car and asked him why she needed to go into the dark trees. He just responded with repeated orders to "walk and to walk, He said go, go." Appellant eventually complied because she was scared and did not think she should ignore a police officer's orders.

---

[1] Martinez was given testimonial immunity at appellant's trial for her admission that she used a fake social security number to secure her employment because she did not have a green card.

After appellant followed her, he continued to ask what was under her shirt. Then he got very close to her and told her to lift up her shirt. Because "he was looking at me ugly" and "talking to me rough" she thought she did not have a choice but to comply. After she lifted her shirt, appellant was still standing very close and then asked what she had under her bra. She again insisted nothing, and testified that it would have been very clear to appellant that there was nothing under her bra. He asked her several times to lift her bra, which she eventually did. She testified again that she complied because she was scared and he was ordering her aggressively.

After Martinez lifted her bra, appellant looked at her and then touched her breasts with both his hands. After he told her to put her bra back down, he told her to leave. She told him she was going home, and he responded, "you don't have any problems. Go on to your work." As appellant was leaving, he asked Martinez if her husband had a green card, and she did not respond. Martinez took down appellant's license plate number on her phone.

When appellant left, he took Highway 99 towards County Road 128. Martinez did not feel safe driving the same direction towards her house because she was worried that appellant might think she was following him and might do something to her. So she instead drove towards her work. Before she left the parking lot, she tried to call her husband twice, but he did not answer. She then

called her boss, Mendieta, as she was leaving the gas station. He met her at the restaurant, and she told him what happened. She was crying and very upset.

Mendieta insisted that she report the incident, but she argued with him, stating that no one was going to believe her over a police officer. Mendieta called G. Mendez, the crime victim liaison for the Pearland Police Department. Martinez talked with Mendez and told her what happened that same day. Martinez also talked to investigators Gamboa and Duearte either that same day or the next day, and she provided a written statement to them.

Duearte showed Martinez a photo line-up on June 29, 2012. She identified appellant in that line-up, initialing his picture. She also identified appellant in the courtroom as the police officer who stopped her and touched her breasts.

Finally, she testified that the police never asked her for DNA or attempted to lift fingerprints from her vehicle.

J. Mendieta testified on June 10, 2012, he received a call from Martinez around 4:50 or 5:00 a.m. Martinez was scared and excited trying to tell him that she was stopped by a sheriff and he touched her and took off her shirt. When Martinez tried to tell Mendieta more details after arriving at work, he told her to wait and so they could find someone to help them. He then called Mendez with the Pearland Police Department. Mendieta is the godfather of Mendez's oldest son, and he understood Mendez's job to involve helping victims of crimes. He put

6

Mendez in touch with Martinez and did not have any more involvement until an officer later came to get a statement from him.

G. Mendez testified that one of her duties as the crime victim liaison for the Pearland Police Department is to contact victims that have reported crimes and inform them about their rights and resources available to them depending on what crime occurred. She explained that a U Visa is one such resource that an undocumented immigrant who has be the victim of a violent crime may apply for.

Mendez said Mendieta called her the evening of June 10, 2012, and, based on what Mendieta told her, Mendez told him to have Martinez call her. After their conversation on June 10th, Mendez stayed in contact with Martinez. In her role as a crime victim liaison, Mendez supplied Martinez with information about resources available to victims. She asked Martinez to report the incident to the police in Brazoria County (because Mendez worked for the Pearland Police Department, and the crime occurred outside that department's jurisdiction). Mendez then referred Martinez to the Brazoria County District Attorney's office, the Brazoria County Women's Center, UMCA International, Catholic Charities, and gave her information about crime victim compensation.

In September of 2012, she also gave Martinez information about U Visas. Mendez's testified that it was her opinion was that Martinez did not know about U Visas until Mendez brought it up to her and encouraged her to apply. Ultimately,

7

Martinez did not receive a U Visa. Martinez never requested money from a crime victim compensation fund. Mendez testified that, in her experience, it can be hard to get undocumented residents to report crimes because of deportation fears.

K. Zipple-Shedd is an attorney and social worker with Catholic Charities. She supervises its crime victims program. She testified that Catholic Charities helps undocumented immigrants apply for U Visas. She explained the statutory criteria—there are certain qualifying crimes, the applicant has to cooperate with law enforcement in investigation and prosecution of the crime, and the victim must have suffered a substantial physical or emotional harm from the crime. An application for a U Visa requires the investigating law enforcement agency to sign a certification, which Martinez was unable to obtain in this case. This is because the Brazoria County District Attorney's office, which would be required to sign off on the certification, has a blanket policy of not providing certifications for victims to apply for U Visas.

P. Gamboa is a bilingual investigator for the District Attorney's office. He became involved in this case when his supervisor notified him on June 10, 2012 that Martinez called with a complaint against an employee of the sheriff's office, but that her English was limited. Gamboa called Martinez, but she was difficult to understand on the phone because she was crying and upset as she tried to explain to him what had happened. On June 11, Gamboa took G. Mendoza, another

investigator with the District Attorneys' Office, to interview Martinez in person at work and at home.

Gamboa found Martinez's version of events consistent and credible. Gamboa collected a written statement from Martinez, and had her show them where the events occurred. Gamboa then contacted the Sheriff's office, which handed the investigation over to its Internal Affairs Investigator, J. Rhyne.

C. Parmiter is a retired lieutenant from the Brazoria County Sheriff's Office ID crime scene unit. She testified to preparing the single-page photo line-up used in this case. She included a picture of appellant and then selected others "of the same race, same sex, . . . close to the same hair color, . . . as close as possible to the physique or facial structure." Because appellant was wearing a uniform in the picture she obtained, she picked additional pictures of employees wearing that same uniform. Parmiter then gave the sealed line-up envelope to another investigator, Duarte, to present the line up to Martinez.

F. Vargas (formerly Duarte) is a criminal investigator for the Brazoria County Sheriff's Office. She became involved in this case on June 18, 2012 because she speaks Spanish. Before meeting with Martinez, she was told that Martinez was claiming to have been touched inappropriately by a deputy, and she was told that appellant was the suspect. She translated Martinez's written statement, as Gamboa had already done, and then she spoke to Martinez in person.

9

On June 29, 2012, Vargas administered to Martinez the sealed photo line-up that Parmiter prepared. Vargas testified as to that procedure, i.e., she explained to Martinez that the envelope might not contain a picture of the suspect. Vargas herself did not know if the envelope contained a picture of appellant. Martinez flipped through the photos and selected the photograph of appellant with no hesitation. Per Vargas's instructions, Martinez signed the page with the photo and it was entered into evidence, along with the other photos from the line-up.

Vargas has worked as a patrol officer in the North area that appellant patrolled and where Martinez alleged she was stopped. She explained that appellant had a "district partner" at the time of the incident, an Officer Anderson. When an officer gets a call, and their district partner is not already at another call, their district partner "tags along" to their partner's call. In other words, they "usually back up each other on calls." For this reason, Vargas examined the radio call logs for both appellant and Anderson for their overnight shift the evening of the 9th and the morning of the 10th. Radio logs reflect two things. If an officer is dispatched to a location, that is recorded on the log. If their district partner or another officer also goes to a scene, they call in their location and that is also recorded on the radio logs.

Anderson's radio logs reflected he was dispatched to scenes on June 9, 2012 at 7:48 p.m., 8:03 p.m., 11:39 p.m., and 11:54; appellant's radio logs show he

responded to each of these four calls with Anderson. On the morning of June 10, 2012, Anderson's radio logs reflect he was dispatched to scenes at 12:46 a.m. and 2:46 a.m.; appellant's radio logs show that he responded to both calls with Anderson.

At 3:32 a.m., appellant's radio logs reflect a "close patrol" in the neighborhood of Pine Colony. At 4:27 a.m., Anderson was dispatched to a scene, but appellant did not accompany him. Another Officer, Officer Gonzalez, responded to that 4:27 a.m. scene with Anderson. The next activity on appellant's logs is at 5:30 a.m., leaving two hours unaccounted for. Vargas could not locate any records during her investigation to account for where appellant was between 3:30 a.m. and 5:30 a.m., i.e., the window of time that Martinez reported appellant stopped and assaulted her.

J. Rhyne is an internal affairs lieutenant with the Brazoria County Sheriff's Office whose job it is to investigate allegations that department personnel have violated Sheriff's Department policies. An internal affairs investigation is kept completely separate from any resulting criminal investigation, and evidence gathered in an internal affairs investigation is not shared with criminal investigators.

On June 11, 2012, Rhyne was told by the Sheriff of Brazoria County that there had been an allegation against "an individual driving the 1552 unit," based

11

upon the license plate number reported by Martinez. Rhyne's first and immediate duty was to obtain the media card out of that unit. Rhyne had the car called in from the street because it was being used that morning by an Officer Miller.

Rhyne explained that each car has a "media card" similar to those used in video cameras, which contains video recorded from that particular car. The media card is secured in the 1552 unit by a locked window. The key is only provided to the shop foreman for initial installation in the car, and then patrol supervisors, sergeants, and lieutenants have a key. The administrative captain and Rhyne also have keys. The driver of the unit does not have a key.

Rhyne explained that when a patrol car's overhead lights are activated, the camera automatically comes on and backs up 30 seconds so as to capture the probable cause for the stop and everyone's activity during the stop. When Officer Miller brought Rhyne the 1552 unit, Rhyne unlocked the recording unit, shut down the DVR according to procedures, and then removed the media card. He plugged the card into a card reader in his office. Upon plugging the card in, all of the videos and data on the card are automatically uploaded to the computer system and the card is wiped clean. This is because the card holds limited data, and each card is specific to the equipment in particular units.

Rhyne was unable to locate any video from June 10, 2012 on the media card. Appellant was working the night shift on June 9, and the last recording for that

shift was a 14-minute stop at 10:47 p.m. on June 9th. The next videos appear at 6:28 and 7:09 the morning of the June 11 when Officer Miller was using the car.

Rhyne next testified about the actual equipment mounted in the 1552 unit. There is a DVR, similar to a home digital video recorder, but it has a secure, locked lid just over the media card. The bottom of the DVR box had the wires that connected to the power and to the camera that is mounted on the dash. These connections are not locked or encased, so an officer could have access to them. Rhyne testified that it would not be difficult for someone to disconnect the power connection at the bottom of the box. It is easy to access and plugs in similar to a phone plug. If the power is unplugged, the DVR will not record. There were logs that would have indicated if the recorder in the 1552 unit was unplugged at anytime on June 10, but the records overwrite themselves every few days, and by the time Rhyne learned of them, it was too late to retrieve the data.

He testified that, based on his tests and the videos taken before and after June 10, the recording unit was functioning on June 10. The lack of video from June 10 is consistent with either no stops being made on June 10, or with the recording device being tampered with.

Finally, Rhyne opined that, even without a recording, other evidence "matches up," i.e., the license plate number Martinez gave matched the 1552 unit, appellant was assigned unit 1552 on the early morning of June 10, 2012, appellant

13

was assigned the North end of the county for that shift, Martinez's allegations place the incident in the North end of the county, Martinez identified appellant in a photo line-up, and appellant's dispatch logs did not account for his whereabouts at the time Martinez alleged he stopped her vehicle.

K Kessel, the vice-president of engineering for the manufacturer of the in-car video system used by Brazoria County, testified that, based upon his knowledge of the system and the information he has, he can "form an opinion as to possible causes of why there may not be a video on the 10th at 4:30 a.m.," i.e., (1) the media card was full and could not record any more data, (2) there was no triggering event,[2] or (3) the system did not have power at the time.

From his examination of the data and the video search results Kessel ascertained that on the morning of June 10, 2012, unit 1552's media card was not full. Without the benefit of the overwritten DVR logs, Kessel could not rule out either the second or third possibilities, i.e., no triggering event or disconnected power.

### 2. Appellant's Case

Appellant recalled two of the State's witnesses, Mendieta and Gamboa. Mendieta was asked about a page from Martinez's employment file that looked as

---

[2] Recording triggering events include activation of overhead lights, exceeding a speed of 80 miles per hour, a collision, and manual activation through a device carried on the officer's belt.

though the bottom half had been cut off. Mendieta denied having done so. Mendieta also testified that he did not know if the social security card that Martinez produced was real or not.

Gamboa testified that Martinez told her that Mendieta came and got her from the gas station where the incident with appellant took place rather than meeting her at the restaurant where she worked.

### 3. The Verdict, Punishment Phase, and Judgment

The jury found appellant guilty of the Class A misdemeanor of official oppression under section 39.03 of the Texas Penal Code, which provides:

§ 39.03. Official Oppression

(a) A public servant acting under color of his office or employment commits an offense if he:

(1) intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful;

(2) intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful; or

(3) intentionally subjects another to sexual harassment.

(b) For purposes of this section, a public servant acts under color of his office or employment if he acts or purports to act in an official capacity or takes advantage of such actual or purported capacity.

(c) In this section, "sexual harassment" means unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, submission to which is made a term or condition of a person's exercise or enjoyment of any right, privilege, power, or immunity, either explicitly or implicitly.

(d) An offense under this section is a Class A misdemeanor, except that an offense is a felony of the third degree if the public servant acted with the intent to impair the accuracy of data reported to the Texas Education Agency through the Public Education Information Management System (PEIMS) described by Section 42.006, Education Code, under a law requiring that reporting.

TEX. PEN. CODE ANN. § 39.03 (West 2011).

The jury was released, and the punishment phase was held before the trial court. The State called Martinez and Vargas. Martinez testified that the incident with appellant had a negative effect on her. She had trouble eating, sleeping, and she cried a lot. Although she has gotten better, she is still scared of police officers.

Vargas testified that, in June 2012, when she was first assigned Martinez's case, the investigation into appellant's conduct only involved Martinez. Later, the investigation was broadened when Vargas learned that a second victim, S. Harrold, had made allegations against appellant regarding his conduct during a traffic stop. Harrold called the Sheriff's office and reported the incident in 2011, but refused to make a formal complaint. Vargas met with Harrold on July 26, 2012. Harrold was very upset, and Vargas found her to be genuine. Harrold identified appellant in a photo line-up. She refused, however, to cooperate in Vargas's investigation because she feared for her safety. Although appellant issued Harrold a citation, he was driving a car that did not have video equipment in it, so there was no recording of the stop. Nothing in Vargas's investigation suggested that Martinez and Harrold knew each other. Unlike Martinez, Harrold had a driver's license and is a citizen.

16

On cross-examination, Vargas agreed that the Brazoria County Sheriff's Office did not take any disciplinary action against appellant after interviewing him and Harrold. Harrold was subpoenaed to testify at appellant's punishment hearing in this case, but did not appear.

Appellant called four witnesses. His mother, father, a friend, and his employer testified that they had written letters to the court to attest to appellant's character that they would like the court to consider.

The punishment range for a Class A misdemeanor is (1) a fine not to exceed $4,000; (2) confinement in jail for a term not to exceed one year; or (b) both such fine and confinement." TEX. PENAL CODE ANN. § 12.21 (West 2011). The trial court assessed punishment at one year's confinement in the Brazoria County Jail and a fine of $2,000. Appellant timely appealed.

## ISSUES ON APPEAL

Appellant raises two issues on appeal here:

1.    "The trial court erred in instructing the Jury 'It is not required that the prosecution prove guilt beyond all possible doubt.'"

2.    "The trial court erred in allowing and considering evidence of extraneous conduct based on hearsay and in violation of defendant's due process rights as recognized under *Crawford*."

# JURY CHARGE

The court's charge contained the following paragraph:

The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant. ***It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt***. In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict not guilty.

(emphasis added)  Appellant objected during the charge conference, requesting that the court strike the statement "It is not required that the prosecution prove guilt beyond all possible doubt."  He argued that "the caselaw out of the 3rd District as well as the 14th and cited cases -- I believe it's *Rodriguez*. I can't recall the cite, the cite that we gave the Court yesterday we discussed. And progeny is error. It's our position that the caselaw suggests that it is prudent -- well, absent an agreement by the parties that it is an error and prudent practice not to be included over objection."  The trial court overruled the objection, "based on the contradicting caselaw that we saw yesterday."

In his first point of error, appellant argues that the trial court erred in overruling his objection to inclusion of this language.  He notes that the Pattern Jury Charges "do not contain, nor advocate for the inclusion of such a definition."  And he stresses that it clearly mattered to the jury, as it sent out a note during

18

deliberations stating, "We want a definition of reasonable doubt that is not influenced by the State or defense."

In 1991, the Court of Criminal Appeals mandated that the following clause regarding reasonable doubt, which includes the language at issue in this case, be included in the charge in all criminal proceedings:

> The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.
>
> ***It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant's guilt.***
>
> A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case. It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.
>
> Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.
>
> In the event you have a reasonable doubt as to the defendant's guilt after considering all the evidence before you, and these instructions, you will acquit him and say by your verdict "Not guilty."

*Geesa v. State*, 820 S.W.2d 154, 162 (Tex. Crim. App. 1991) (emphasis added), *overruled by Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000).

Appellant relies on the Court of Criminal Appeals' admonishment in *Paulson v. State*—the case that overruled *Geesa*—that "[i]t is ill-advised for us to require trial courts to provide the jury with a redundant, confusing, and logically-flawed definition [of reasonable doubt] when the Constitution does not require it,

19

no Texas statute mandates it, and over a hundred years of pre-*Geesa* precedent discourages it." 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). The *Paulson* Court explained that "the better practice is to give no definition of reasonable doubt at all to the jury." *Id.* The Court, however, also noted "[o]n the other hand, if both the State and the defense were to agree to give the *Geesa* instruction to the jury, it would not constitute reversible error for the trial court to acquiesce in their agreement." *Id.*

Both appellant and the State acknowledge that, after *Paulson*, a split developed among the courts of appeals about the propriety of inclusion in a charge of the particular sentence at issue here, i.e., "It is not required that the prosecution prove guilt beyond all possible doubt." *See Fluellen v. State*, 104 S.W.3d 152, 164 (Tex. App.—Texarkana 2003, no pet.) ("There is a split among the appellate courts that have addressed this issue on the question of whether use of this language in the charge is error.")

Several courts, including this one, have concluded that this language does not actually *define* reasonable doubt, but rather is *an instruction* regarding reasonable doubt that does not run afoul of *Paulson*'s holding that reasonable doubt should not be defined. We first addressed this in *Carriere v. State*:

> Appellant argues it was reversible error for the trial court to charge the jury: "It is not required that the prosecution prove guilt *beyond all possible doubt*; it is required that the prosecution's proof excludes all *reasonable doubt* concerning the defendant's guilt." (Emphasis

20

added). We note that the Waco Court of Appeals recently held that the submission of this same language in a jury charge was error. *See Phillips v. State*, 72 S.W.3d 719 (Tex. App.—Waco 2002, no pet.). We respectfully disagree.

Although this Court recognizes that the above language is mentioned in *Geesa*, we hold that it is not the sort of instruction prohibited by *Paulson*. *Geesa*, 820 S.W.2d at 162. In reviewing the charge, we must determine: (1) whether there is error in the charge; and (2) whether sufficient harm resulted requiring reversal. *Hutch v. State*, 922 S.W.2d 166, 170–71 (Tex. Crim. App. 1996); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985); *Morales v. State*, 4 S.W.3d 455, 457 (Tex. App.—Houston [1st Dist.] 1999, no pet.). Because we conclude there was no error in this case, we do not conduct a harm analysis.

According to *Paulson*, when the court is evaluating a jury charge for a reasonable-doubt-definition error, we must first determine if a definition of reasonable doubt exists in the jury charge. *Paulson*, 28 S.W.3d at 573. If not, the charge does not violate *Paulson*. In our case, the trial court instructed the jury "it is not required that the prosecution prove guilt beyond all doubt." This instruction does not lessen the State's burden of proof, especially in light of the second sentence which correctly repeats the State's burden that, "it is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt." The charge was proper because it did not define reasonable doubt—it merely instructed the jury that appellant's guilt must be proved beyond a reasonable doubt, not beyond all possible doubt.

The *Paulson* court held the "better practice" was to avoid defining reasonable doubt for the jury. *Id*. "Better practice" does not preclude a court from submitting a proper charge in a different fashion. If including any instruction or definition regarding reasonable doubt would constitute error, the *Paulson* court was in a position to say so and, instead, it remained silent to that effect. We must review each charge, and each objection therein, on a case-by-case basis, to determine if error exists.

21

84 S.W.3d 753, 759 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *see also Minor v. State*, 91 S.W.3d 824, 829 (Tex. App.—Fort Worth 2002, pet. ref'd) ("The exact same language was utilized in the charge at bar, and we, like the *Carriere* court, conclude that this language does not constitute a definition of reasonable doubt and, therefore, does not violate *Paulson*."); *Fluellen*, 104 S.W.3d at 164–65 (holding that language was not erroneous or, alternatively, on the facts presented, it was harmless); *Hanks v. State*, 104 S.W.3d 695, 701, 702 (Tex. App.—El Paso 2003) ("We agree with those courts holding that the challenged instruction does not constitute a definition of reasonable doubt and, therefore, does not violate *Paulson*."*), aff'd on other grounds*, 137 S.W.3d 668 (Tex. Crim. App. 2004); *Torres v. State*, 116 S.W.3d 208, 212 (Tex. App.—El Paso 2003, no pet.) ("[W]e agree with those courts holding that the challenged instruction does not constitute a definition of reasonable doubt and, therefore, does not violate *Paulson*."); *Ochoa v. State*, 119 S.W.3d 825, 829 (Tex. App.—San Antonio 2003, no pet.) ("We, like our sister court, believe that the disputed language does not constitute a definition of reasonable doubt and, therefore, does not violate *Paulson*."); *O'Canas v. State*, 140 S.W.3d 695, 702 (Tex. App.—Dallas 2003, pet. ref'd) ("We agree with the Houston (First District) Court of Appeals's decision in *Carriere* that paragraph [3] of the *Geesa* instruction does not define reasonable doubt.").

Other courts have disagreed with our assessment that this language does not constitute a "definition" of "reasonable doubt" under *Paulson*, but nonetheless have found its inclusion to be permissible. *Vosberg v. State*, 80 S.W.3d 320, 324 (Tex. App.—Fort Worth 2002, pet. ref'd) ("The language in question, 'It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all 'reasonable doubt' concerning the defendant's guilt,' merely notes that reasonable doubt does not mean possible doubt."); *Brown v. State*, 91 S.W.3d 353, 358–59 (Tex. App.—Eastland 2002, no pet.) (holding that it was not error to include entire *Geesa* charge and, alternatively, because appellant did not object to charge, he did not meet burden of showing he suffered egregious harm as a result of any error); *Jackson v. State*, 105 S.W.3d 321, 325 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding that inclusion of language, while discouraged by *Paulson*, was not error and, alternatively, because appellant did not object to charge, he did not meet burden of showing he suffered egregious harm as a result of any error).

Finally, two other courts held that inclusion of the language appellant complains of in this case to be erroneous, but harmless on the facts. *Phillips v. State*, 72 S.W.3d 719, 721 (Tex. App.—Waco 2002, no pet.) (holding inclusion to be error under *Paulson*, but that "after a thorough evaluation of the record," concluding it was harmless); *Rodriguez v. State*, 96 S.W.3d 398, 405–06 (Tex.

23

App.—Austin 2002, pet. ref'd) (holding that inclusion of language was error under *Paulson*, but that the "evidence was overwhelming" against defendant and that, "[a]fter an examination of the entire record, . . . the error in the jury charge was not calculated to injure appellant's rights").

In 2004, and again in 2010, the Court of Criminal Appeals provided additional guidance on this issue. In *Woods v. State*, the court held that the trial court "did not abuse its discretion" by including in the charge the statement: "It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all 'reasonable doubt' concerning the defendant's guilt." 152 S.W.3d 105, 115 (Tex. Crim. App. 2004).[3] In *Mays v. State*, without noting whether the language had been objected to at the charge conference, the Court of Criminal Appeals characterized this same language at different places in the opinion as "defin[ing] reasonable doubt" and as an "instruction on reasonable doubt." 318 S.W.3d 368, 389 (Tex. Crim. App. 2010). Ultimately, while recognizing again its prior holding that "the better practice" is to not define "reasonable doubt," the *Mays* court relied upon *Woods* to reject the appellant's argument that inclusion of this language was error. *Id.*

We are bound to follow the interpretation of *Paulson* set forth in *Carriere* that we have continued to apply in subsequent cases. *See Bates v. State*, Nos. 01-

---

[3]    Unlike this case, the defendant in *Woods* had not objected to the language at the charge conference.

04-00930-CR; 01-04-00931-CR, 2005 WL 3005566, at *3 (Tex. App.—Houston [1st Dist.] Nov. 10, 2005, no pet.) (mem. op.; not designated for publication); *Casanova v. State*, Nos. 01-01-00905-CR, 01-01-00906-CR, 01-01-00907-CR, 2002 WL 31838498, at *1 (Tex. App.—Houston [1st Dist.] Dec. 19, 2002, pet. ref'd) (mem. op.; not designated for publication). And regardless of whether the language appellant complains of is an "instruction" or "definition," *Woods* and *Mays* confirm that inclusion of this language alone is not error. Accordingly, the trial court did not err in overruling appellant's objection to its inclusion in the charge.

We overrule appellant's first point of error.

## HEARSAY AND DUE PROCESS

In his second point of error, appellant complains that the "trial court erred in allowing and considering evidence of extraneous conduct based on hearsay and in violation of defendant's due process rights as recognized under *Crawford*" v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). Specifically, he argues:

> During the punishment phase of the trial, the State called Francine Varga, an investigator with Brazoria County Sheriff's Department to detail her investigation into a reported allegation in which Appellant was identified as the alleged perpetrator. The origin of the investigation was a complaint made via telephone by S[.] Harrold sometime in February of 2012. This witnesses' investigation was a follow-up to that initial complaint and began in July 2012, five (5) months after the initial complaint.

25

Over objections based specifically on hearsay, foundation and *Crawford*, the Court allowed the State to elicit testimony from Investigator Vargas regarding the hearsay statements made to the Investigator by the alleged complainant (S[.] Harrold), as well as statements made during the out-of-court identification procedure in which she purported to identify Appellant and included the photo array lineup identification Ms. Harrold was subpoenaed by the State, however did not appear.

The State responds that the testimony at issue did not violate the rule against hearsay testimony or appellant's right of confrontation under *Crawford*. Specifically, it argues that Varga testified only to things in her personal knowledge related to the investigation of Harrold's complaint, rather than things that were told to her by other people. Alternatively, the State argues that, "[e]ven if there had been error in admitting this testimony, it would have been harmless because of the limited nature of the evidence admitted."

During the punishment phase, the State may offer evidence of any extraneous crime or bad act that is shown, beyond a reasonable doubt, either to have been (1) an act committed by the defendant or (2) an act for which he could be held criminally responsible. *See Fields v. State*, 1 S.W.3d 687, 688 (Tex. Crim. App. 1999); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1). "Prior crimes or bad acts are introduced to provide additional information which the jury may consider in determining what sentence the defendant should receive." *See Arthur v. State*, 11 S.W.3d 386, 392 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).

26

Admission of evidence about extraneous offenses is permissible only after the trial judge has made a threshold determination that evidence regarding an extraneous crime is relevant, and the fact-finder must be satisfied beyond a reasonable doubt that these prior acts are attributable to the defendant. *See Fields*, 1 S.W.3d at 688; *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996). Once this threshold is met, the fact-finder may use the evidence however it chooses in assessing punishment. *See Fields*, 1 S.W.3d 688.

We need not address whether any portion of Vargas's testimony violated the rule against admission of hearsay or the right of confrontation under *Crawford*, because we conclude that error, if any, was harmless in this case.

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). The Confrontation Clause of the Sixth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.

In *Crawford*, the Supreme Court held that the admission of a hearsay statement made by a non-testifying declarant violates the Sixth Amendment if the statement was testimonial, and the defendant lacked a prior opportunity for cross-

27

examination. 541 U.S. at 68, 124 S. Ct. 1354, at 1371. The Court identified three kinds of statements that could be regarded as testimonial:

(1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially";

2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and

3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* at 51–52; 124 S. Ct. at 1364..

The Court of Criminal Appeals has instructed that courts reviewing whether the error in admitting out-of-court statements in violation of *Crawford* is harmless beyond a reasonable doubt should consider, among other things:

(1) The importance of the hearsay statements to the State's case;

(2) Whether the hearsay evidence was cumulative of other evidence;

(3) The presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and

(4) The overall strength of the prosecution's case.

*Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006). The ultimate inquiry is whether the reviewing court is convinced, beyond a reasonable doubt, that admission of *Crawford*-barred testimony "would probably not have had a significant impact" on the fact-finder's mind. *Id.*

28

In this case, after a careful review of the entire record, we are confident that the admission of Vargas's testimony during the punishment phase of the trial probably did not have a significant impact on the trial court's assessment of punishment.

During the guilt-innocence stage of the trial, the State requested more than once that it be allowed to call Harrold as a witness to rebut the appellant's theory that Martinez gave inconsistent and fabricated statements. The trial court denied that request, so there was no evidence of alleged extraneous offenses presented to the jury at the guilt-innocence stage.

During the punishment hearing—held before the trial court, not the jury— Harrold did not show up to testify about her complaint against appellant, despite a subpoena being issued compelling her appearance. Appellant objected to, and filed a motion in limine, to exclude testimony about extraneous offenses by anyone except an actual alleged victim.

The State in response argued that it was entitled to elicit testimony from the investigator about Harrold's complaint, as long as it stayed away from eliciting testimonial hearsay. The trial court responded:

> THE COURT: Well, the thing of it is, this is to me. You can object to that. And as far as if it is hearsay then I'll take that. But I'm not going to limine out them putting on whatever they think is appropriate. You can object to whatever you want to feel that's appropriate and certainly to the extent it is hearsay I will just say this. Even if it comes in the Court won't consider it. . . . . Well, as it comes just you can

allege it as to hearsay, lodge it as to hearsay and *Crawford* and Mr. Clayton needs to stay away from that. Even though I won't consider it let's not put something in the record that may cause a problem down the road.

When Vargas testified about her investigation into Martinez's complaint, Vargas stated "I was made aware of a case where it had happened prior."

Q. And you were made aware of that second allegation?

A. Correct.

Q. What was the name of the complainant in that second allegation?

A. S[.] Harrold.

Q. Based on your investigation when was it that the -- that the allegation involving S[.] Harrold happened?

[Defense counsel]: I'm going to object, Judge, under hearsay and under *Crawford*. That information would be based on hearsay she got from someone else.

[The State]: I think I can clarify the question if I may, Judge?

THE COURT: You may.

Q. I want to talk not about anything that S[.] Harrold told you. I want to be real clear about that. Okay?

A. Okay.

Vargas was permitted to testify that she first received information about Harrold's complaint against appellant from Captain Kincheloe, and that Harrold did not return Vargas's calls when she tried to follow up on information received from Kincheloe. The trial court sustained objections to the State's questions about (1) what information Vargas received from Kincheloe, (2) what kind of conduct by appellant formed the basis of Harrold's allegations, and (3) whether the complaints

30

by Martinez and Harrold were based on similar conduct.[4] Vargas was only allowed to testify that she eventually met with Harrold, Harrold was upset and appeared genuine, and Harrold would not file a formal complaint against appellant. Finally, Vargas testified, over appellant's objection, that Harrold identified appellant in a photographic line-up. On cross-examination, Vargas conceded that the department did not perform a formal investigation into Harrold's allegation, and that no action was taken against appellant as a result of Harrold's complaint.

At the close of the punishment hearing, the court took judicial notice of the Presentence Investigation Report (PSI), which—among other things—contained reference to Harrold's complaint.

The court did not address Harrold's complaint specifically, nor did it discuss how Vargas's testimony about the investigation weighed into its punishment decision. When discussing other potential witnesses at the punishment hearing, however, the court stated, "But if somebody is not willing here to testify to what they say, I don't put much stock into them. . . . . If they want to testify I will take it into account."

Finally, the court discussed the basis of its decision to assess a punishment that includes confinement, and there was no mention of Vargas's testimony about

---

[4] Later during Vargas's testimony, in response to the question "why are you -- as an investigator why are you then looking into the allegation against Ms. Harrold?," Vargas stated "Because they are very similar in allegation." No objection was lodged by appellant to that question or response.

31

the investigation into Harrold's complaint. Rather, the court focused on appellant's failure to take responsibility for the actions leading to his conviction:

> [State's counsel] knows this Court very well and correctly stated that I view incarceration as a last resort and I like to use community supervision where there is a problem that can be rehabilitated. But I've reviewed the file, I've reviewed the letters, I've reviewed all of the letters since I was now asked to take judicial notice of them, and from what I read, Mr. Burrows, everybody that knows you said that you are a person of no problems and by your own evaluation in the PSI you don't think there are either. So I don't really think there is anything that can be gained by putting you on community supervision. So because of that the Court will assess your punishment at 365 days in the Brazoria County Jail. I will assess a fine of $2,000.

In sum, we conclude that any error in allowing Vargas to testify during the punishment phase was harmless because (1) Harrold's complaint was a part of the PSI report for the court to consider regardless of Vargas's testimony, (2) the court stated that it would not consider any evidence that violated the rule against hearsay, even if it was admitted at the punishment hearing, (3) appellant did an effective job during cross-examination of Vargas of eliciting testimony that the Sheriff's Department did not pursue any action on Harrold's informal complaint, (3) the court stated that it based its sentencing decision its assessment that appellant could not be rehabilitated because neither appellant nor anyone around him believed that there was anything wrong with his conduct, and (4) appellant received a relatively short sentence in light of the allegations and strong evidence of his abusing his power as an officer and attempts to intimidate Martinez.

32

Accordingly, we are convinced, beyond a reasonable doubt, that Vargas's punishment-phase testimony did not have a "significant impact" on the court's assessment of punishment. *Davis*, 203 S.W.3d at 852.

We overrule appellant's second point of error.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.

Publish. TEX. R. APP. P. 47.2(b).